# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| RIVER NORTH COLLECTIONS, LLC and ROGER L. WESTON, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. |
| EMIGRANTA CORP. and EMIGRANT BANK FINE ART FINANCE, LLC, | ) | Hon. |
| Defendants. | ) | |

2018CH00704
CALENDAR/ROOM 02
TIME 00:00
Injunction

RECEIVED - C.D.C.
2018 JAN 18 PM 12:00
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs River North Collections, LLC ("River North") and Roger L. Weston ("Weston") (collectively, "Plaintiffs"), by their attorneys, Novack and Macey LLP, for their complaint against Defendants Emigranta Corp. ("Emigranta") and Emigrant Bank Fine Art Finance, LLC (the "Bank") (collectively, "Defendants"), state as follows:

**Nature Of The Action**

1. This an action for declaratory and injunctive relief. Defendants are seeking to enforce a purported $5 million promissory note, security agreement and UCC financing statement, each as amended (collectively, the "Purported Loan Documents," as more particularly defined below).

2. However, the Purported Loan Documents are products of multiple forgeries. Although Defendants have been advised of the forgeries, they persist in seeking to enforce the alleged loan and the Purported Loan Documents.

3. The property purportedly standing as security for the forged loan consists of unique and extremely valuable pieces of museum-quality Chinese art.

4.      Plaintiffs seek declaratory relief to establish that:  (a) the Purported Loan Documents are forged instruments and are void and unenforceable; (b) Plaintiffs owe no payment, collateral or other obligations in connection with any of the Purported Loan Documents; and (c) the purported collateral for the purported loan is not subject to any valid security agreement, claim or interest in favor of Defendants.  Plaintiffs seek preliminary and permanent injunctive relief to protect their valuable rights for which there is no adequate remedy at law and without which they will suffer irreparable harm.

**Parties**

5.      Plaintiff River North is an Illinois limited liability company with offices in Chicago, Illinois.

6.      Plaintiff Weston is an individual who resides in Naples, Florida.

7.      Defendant Emigranta is a New York corporation with offices in New York, New York.

8.      Defendant Bank is a limited liability company organized under the laws of Delaware with offices in New York, New York.

**Jurisdiction And Venue**

9.      Defendants are subject to personal jurisdiction in Illinois.  Among other things: (a) Defendants communicated with an individual located in Illinois to obtain his -- wholly unauthorized -- execution of the Purported Loan Documents in Illinois; and (b) Defendants recorded a purported UCC Financing Statement in Illinois against property located in Illinois.

10.      Venue is proper in this Court pursuant to Section 2-101(2) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101(2), because all or part of the transaction at issue took place in Cook County, Illinois.

11. Certain of the Purported Loan Documents contain a New York venue selection provision, but that provision, like the purported agreements of which it is a part, is a product of forgery (as described further below) and is unenforceable and void *ab initio*.

**General Allegations**

12. Weston is, among other things, a world-renowned art collector and exhibitor. He is a trustee of the Art Institute of Chicago (the "Museum") and the chairman of its Asian art committee. Weston and his wife have donated, among other things, valuable Japanese artwork to the Museum that is displayed in a gallery bearing their names.

13. River North is a limited liability company of which Weston's revocable trust is the sole member. River North owns valuable pieces of historical Chinese art that were located and selected by Weston and are stored in Cook County, Illinois.

14. Sultan Issa ("Issa") is an individual who provided certain financial services to Weston, his family and their related entities. In or around 2014, Issa suggested to Weston that he might be able to collateralize pieces of Chinese artwork from the River North art collection to obtain a line of credit.

15. Issa initiated discussions with the Bank, which makes loans collateralized by works of fine art. Weston was interested only in a line of credit under which he would not have to draw any funds, or start paying interest, unless and until he needed funds. Weston spoke to the Bank just one time, in the second half of 2014. No agreement was signed or concluded at that time.

16. Thereafter, Weston heard nothing from the Bank and no agreement was reached with or signed by Weston. As such, Weston assumed that there was no and would be no loan of any kind from the Bank.

17. However, unbeknownst to Weston and without his authority, Issa:

(a)     Secretly arranged for the Bank to provide a purported $5.0 million "Term" loan to River North and Weston;

(b)     Forged Weston's signatures on the Purported Loan Documents;

(c)     Purported to collateralize numerous unique and valuable pieces of the River North art collection (the "Purported Collateral"); and

(d)     Directed the Bank to fund the purported loan proceeds to an account from which Issa withdrew monies for his own selfish purposes.

18.     Issa, without any authority to do so, forged Weston's signature individually and on behalf of River North, without limitation, on the following purported loan documents (the "Purported Loan Documents"):

(a)     A purported Term Note dated October 3, 2014, a copy of which is attached as Exhibit A (the "Purported Term Note");

(b)     A purported Security Agreement dated October 3, 2014, a copy of which is attached as Exhibit B (the "Purported Security Agreement");

(c)     A purported Allonge to Term Note dated December 9, 2015, a copy of which is attached as Exhibit C;

(d)     A purported Second Allonge to Term Note dated June 5, 2017, a copy of which is attached as Exhibit D; and

(e)     A purported Amendment of Security Agreement dated June 5, 2017, a copy of which is attached as Exhibit E.

19.     Furthermore, Issa, without any authority to do so:  (a) purported to close the purported loan evidenced and/or collateralized by the Purported Loan Documents; and (b) obtained

and withdrew the entirety of the $5.0 million in loan proceeds (except fees paid to the Bank) for his own selfish purposes.

20.     The Purported Security Agreement, as amended, purports to appoint Emigranta as the agent of the Bank for the purposes of enforcing the Bank's rights thereunder, including with respect to the Purported Collateral. On October 3, 2014, Defendants recorded a purported UCC Financing Statement in favor of Emigranta and against the Purported Collateral (the "Purported UCC Financing Statement"). A copy of the Purported UCC Financing Statement, as amended, is attached as Exhibit F. The Purported UCC Financing Statement is among the Purported Loan Documents that Defendants claim are enforceable.

21.     Weston learned only recently of the purported loan, Issa's forgery, the unauthorized attempt to pledge the Purported Collateral and Issa's unauthorized taking of loan proceeds.

22.     Weston promptly notified Defendants in writing of Issa's wrongdoing and the invalidity of the Purported Loan Documents.

23.     Despite the foregoing, the Bank has proceeded to seek to enforce the forged Purported Loan Documents against Weston and River North. Among other things, the Bank has attempted to declare a loan default by letters dated November 15, 2017 and January 12, 2018.

24.     The Purported Collateral consists of unique, historical, valuable and irreplaceable Chinese artwork that took more than a decade to accumulate, through the exercise of substantial effort, expense and expertise.

25.     Accordingly, River North and Weston bring this action to obtain declaratory and injunctive relief to, among other things, prevent the Bank and its agent Emigranta from enforcing or seeking to enforce the invalid, fraudulently obtained and forged Purported Loan Documents.

**Declaratory Relief**

26. As set forth above, there is an actual controversy between the parties as to, among other things, the following:

(a) The validity and/or enforceability of the Purported Loan Documents (Exs. A through F);

(b) The validity and/or enforceability of all UCC Financing Statements filed by Defendants with respect to the Loan Documents or against the Purported Collateral, including, without limitation, the Purported UCC Financing Statement filed on October 3, 2014 (Ex. F).

(c) The existence of a purported default with respect to the Purported Term Note dated October 3, 2014, as amended (Exs. A, C and D); and

(d) Emigranta's purported right to take possession of, sell or otherwise dispose of the Purported Collateral.

27. The declarations sought herein will terminate the controversy between the parties, or some part thereof, giving rise to this proceeding.

**Preliminary And Permanent Injunctive Relief**

28. Defendants' wrongful conduct is continuing. Among other things, Defendants have issued notices of default dated November 15, 2017 and January 12, 2018 and continue to seek to enforce the forged and invalid Purported Loan Documents.

29. As set forth above, Plaintiffs: (a) have a clear and ascertainable right with respect to the Purported Loan Documents and Purported Collateral; (b) will suffer irreparable injury if the requested injunctive relief is not granted; and (c) lack an adequate remedy at law.

30.     Moreover, Plaintiffs have a likelihood of success on the merits. Among other things, Plaintiffs have shown that there is a fair question about the existence of their rights with respect to the Purported Loan Documents and Purported Collateral. As set forth above, the Purported Loan Documents are void -- having been procured through forgery and fraud unbeknownst to the Plaintiffs -- and, as such, they do not give rise to a valid right to take, sell or otherwise dispose of the Purported Collateral.

31.     Permitting Defendants to enforce the void Loan Documents would leave Plaintiffs without an adequate remedy at law and would enable the sale of valuable, one-of-a-kind artwork that Plaintiffs did not intend to -- and did not -- pledge to Defendants as collateral.

32.     Defendants will suffer no hardship as a result of being ordered to maintain the status quo while the status of the Purported Loan Documents and rights in the Purported Collateral are decided.

WHEREFORE, Plaintiffs River North Collections, LLC and Roger L. Weston respectfully request entry of a judgment in their favor and against Defendants Emigrant Bank Fine Arts Finance, LLC and Emigranta Corp., as follows:

A.     Declaring that the Purported Loan Documents and each of them are void and unenforceable;

B.     Declaring that the Purported Collateral is not subject to any right, claim or security or other interest of, by or in favor of Defendants or either of them;

C.     Enjoining Defendants -- preliminarily and permanently -- from enforcing or seeking to enforce the Purported Loan Documents in any fashion, including with respect to Plaintiffs or the Purported Collateral;

D. Enjoining Defendants -- preliminarily and permanently -- from enforcing or seeking to enforce the Purported UCC Financing Statement with respect to the Purported Collateral;

E. Awarding Plaintiffs their litigation expenses and costs of suit; and

F. Awarding Plaintiffs such other and further relief as is appropriate.

Respectfully submitted,

RIVER NORTH COLLECTIONS, LLC AND
ROGER L. WESTON

By: ______________________________
One of Their Attorneys

Stephen Novack
*snovack@novackmacey.com*
Stephen J. Siegel
*ssiegel@novackmacey.com*
Courtney D. Tedrowe
*cdt@novackmacey.com*
Novack and Macey LLP
100 North Riverside Plaza
Chicago, Illinois 60606-1501
(312) 419-6900
Firm I.D. No. 91731
Doc# 965854

# EXHIBIT A

**TERM NOTE**

New York, New York

October 3, 2014

$5,000,000.00

I. **Promise to Pay.** FOR VALUE RECEIVED, each of the undersigned hereby jointly and severally promises to pay, on the earlier of October 3, 2019 or the date, if any, on which the Obligations (as defined below) are declared due and payable by the Lender under paragraph VIII (the "Maturity Date"), to the order of EMIGRANT BANK FINE ART FINANCE, LLC (the "Lender"), at its office at 6 East 43rd Street, 25th Floor, New York, New York 10017 or at such other office as the Lender may subsequently designate in writing, the principal sum of FIVE MILLION U.S. DOLLARS (US$5,000,000.00) or, if less, the unpaid principal of the amount advanced hereunder. Repaid advances may not be reborrowed. Each of the undersigned also jointly and severally agrees to pay interest on any and all unpaid amounts from and including the date hereof to the Business Day (a day of the year on which banks in New York City are not required or permitted to be closed) on which any principal amount becomes due, at the interest rate per annum as determined in accordance with the terms below, but in no event in excess of the maximum rate permitted by applicable law. The undersigned further agrees to pay interest on all obligations of the undersigned hereunder at any time that an Event of Default (as defined below) has occurred and is continuing, payable upon demand, at the Base Rate (as defined below) plus 8%, but in no event in excess of the maximum rate permitted by applicable law. The proceeds of the advance hereunder shall be used by the undersigned for lawful purposes only.

II. **Interest; Closing Fee.** The undersigned promises to pay interest on the outstanding amount of the advance hereunder monthly on the last Business Day of each month (in arrears) at an interest rate equal at all times to the Base Rate. "Base Rate" means the greater of: (a) a fluctuating interest rate per annum equal at all times to the prime rate published from time to time in the "Key Rates" section on the website "bloomberg.com" plus 0.50%; and (b) 3.75% per annum. All computations of interest shall be made by the Lender on the basis of a year of 360 days for the actual number of days elapsed; provided, however, that, if such computation shall cause the amount of interest payable hereunder to exceed the maximum rate of interest permitted by applicable law, all computations of interest shall be made upon the basis of a year of 365 or 366 days. Each determination of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error. In addition, the undersigned shall pay a closing fee to the Lender on the date hereof in the amount of $37,500, which fee shall be fully earned and non-refundable when paid. Of such fee, $12,500 shall be payable by Lender to UBS as a loan referral fee.

A. **Highest Lawful Rate.** Notwithstanding anything to the contrary contained elsewhere in this Note or in any other document related to this Note, the parties hereto hereby agree that all agreements between them under this Note and any other document related to this Note, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no contingency or event whatsoever shall the amount paid, or agreed to be paid, to the Lender for the use, forbearance, or detention of the money loaned to the undersigned and evidenced hereby or thereby or for the performance or payment of any covenant or obligation contained herein or therein, exceed the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations, under the laws of the State of New York (or the laws of any other jurisdiction whose laws may be mandatorily applicable notwithstanding other provisions of this Note and the other documents related to this Note), or under applicable federal laws which may presently or hereafter be in effect and which allow a higher maximum non-usurious interest rate than under the laws of the State of New York (or such other jurisdiction), in any case after taking into account, to the extent permitted by applicable law, any and all relevant payments or charges under this Note and the other documents related to this Note executed in connection herewith, and any available exemptions, exceptions and exclusions (the "Highest Lawful Rate"). If due to any circumstance whatsoever, fulfillment of any provision of this Note or any other document

related to this Note at the time performance of such provision shall be due shall exceed the Highest Lawful Rate, then, automatically, the obligation to be fulfilled shall be modified or reduced to the extent necessary to limit such interest to the Highest Lawful Rate, and if from any such circumstance the Lender should ever receive anything of value deemed interest by applicable law which would exceed the Highest Lawful Rate, such excessive interest shall be applied to the reduction of the principal amount then outstanding hereunder or on account of any other then outstanding Obligations and not to the payment of interest, or if such excessive interest exceeds the principal unpaid balance then outstanding hereunder and such other then outstanding Obligations, such excess shall be refunded to the undersigned. All sums paid or agreed to be paid to the Lender for the use, forbearance, or detention of the Obligations and other Debt (as defined below) of the undersigned to the Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such Debt, until payment in full thereof, so that the actual rate of interest on account of all such Debt does not exceed the Highest Lawful Rate throughout the entire term of such Debt. The terms and provisions of this paragraph shall control every other provision of this Note, the other documents related to this Note and all other agreements between the parties hereto.

**III. Payments.** All payments of principal, interest and other amounts due under this Note shall be made to the Lender by check or wire transfer to account number 260352333500 maintained with *Emigrant Bank* (ABA Number 226070403) in lawful money of the United States not later than 12:00 noon (New York City time) on the day when due. The Lender shall provide to the undersigned, no later than ten Business Days before the last Business Day of each month, an invoice indicating the amount of accrued and unpaid interest that will become due on the last Business Day of such month if no further advances are made before such last Business Day. The Lender's failure to provide such an invoice to the undersigned shall not excuse the undersigned from making any payments required under this Note on the date any such payment is due or from complying with any of the terms hereof to comply with the terms of the Security Agreement dated the date hereof (as amended, supplemented or otherwise modified from time to time, the "Security Agreement") by the undersigned in favor of Emigranta Corp., as agent for the Lender. All payments of principal, interest and other amounts payable hereunder shall be made without defense, claim, counterclaim, setoff or recoupment. The proceeds of any advance hereunder shall be wired otherwise made as directed by the undersigned.

**A. Principal Repayment.** The undersigned shall repay the principal amount of this Note in full on the Maturity Date.

**B. Prepayments.** The undersigned shall have the right to prepay this Note in whole or in part at any time, without penalty; provided, however, that should the undersigned repay this Note in whole or in part on or before the one-year anniversary of the date hereof, the undersigned shall pay the Lender a prepayment fee equal to one percent (1.0%) of the principal amount prepaid.

**C. Increased Costs.** If, after the date of this Note, any change in applicable law or regulation or in the interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof (whether or not having the force of law), and which change is applicable generally to other financial institutions, shall change the basis of taxation of payments to the Lender of the principal of or interest on the advances made by the Lender hereunder or any fees or other amounts payable hereunder (other than changes in respect of taxes imposed on the overall net income of the Lender), or shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by the Lender or shall impose on the Lender any other condition affecting this Note or the advances hereunder, and the result of any of the foregoing shall be to increase the cost to the Lender of making or maintaining the advances hereunder or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the undersigned shall pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

IV. **Taxes.**

(a) Any and all payments by the undersigned under this Note shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (all such taxes, levies imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").

(b) In addition, the undersigned shall pay any present or future stamp, documentary, excise, property or similar taxes, charges or levies that arise from any payment made under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note (all such taxes, charges and levies being hereinafter referred to as "Other Taxes").

(c) The undersigned shall indemnify the Lender for the full amount of Taxes and Other Taxes, and for the full amount of taxes imposed by any jurisdiction on amounts payable under this Paragraph IV, paid by the Lender and any liability (including, without limitation, penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto. This indemnification payment shall be made within thirty days from the date the Lender makes written demand therefor.

(d) Without prejudice to the survival of any other agreement of the undersigned under this Note, the agreements and obligations of the undersigned contained in this Paragraph IV shall survive the payment in full of principal and interest under this Note.

V. **Representations and Warranties.** To induce the Lender to make any advance under this Note, the undersigned represents and warrants as follows: (i) all necessary action has been taken to authorize the execution, delivery and performance by the undersigned of this Note and all agreements, instruments and other documents executed in connection herewith, and the transactions contemplated hereby and thereby; (ii) the execution, delivery and performance by the undersigned of this Note and all agreements, instruments and other documents executed in connection herewith do not contravene any law or contractual restriction binding on or affecting the undersigned or any of the undersigned's property; (iii) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the undersigned of this Note or any agreements, instruments and other documents executed in connection herewith; (iv) this Note and all agreements, instruments and other documents executed in connection herewith is the legal, valid and binding obligation of the undersigned enforceable against the undersigned in accordance with its terms; (v) there is no pending or threatened investigation, litigation or proceeding affecting the undersigned that (A) could be reasonably likely to have a material adverse effect on the financial condition, assets, liabilities, operations or prospects of the undersigned or the ability of the undersigned to perform the undersigned's obligations under this Note or any agreements, instruments and other documents executed in connection herewith or (B) purports to affect the legality, validity or enforceability of this Note or any agreements, instruments and other documents executed in connection herewith; (vi) since the date of the most recent financial statements of the undersigned and any guarantor furnished to the Lender in connection with this Note, no event has occurred that could be reasonably likely to have a material adverse effect on the financial condition, assets, liabilities, operations or prospects of the undersigned or any guarantor or the ability of the undersigned or any guarantor to perform the undersigned's or guarantor's obligations under this Note or any agreements, instruments and other documents executed in connection herewith; (vii) except with respect to the Existing Debt as set forth in the most recent financial statements of the undersigned, there exist no liens, security interests or other charges or encumbrances, or any other type of preferential arrangements, upon or with respect to any of the undersigned's properties or the properties of any guarantor, and neither the undersigned nor any guarantor has assigned any right to receive income to

secure any Debt (as defined below) of any person or entity except the Lender and liens securing the Existing Debt (defined below), provided that such liens do not encumber the Collateral (as defined in the Security Agreement); and (viii) the undersigned have no Debt except for Debt disclosed on Roger L. Weston's personal financial statement dated July 24, 2014 (the "Existing Debt") and the Debt owed the Lender.

**VI. Conditions Precedent.** The obligation of the Lender to make the initial advance hereunder is subject to the delivery to the Lender of the following: (i) this Note and the Security Agreement, each duly executed by undersigned; (ii) evidence of insurance acceptable to the Lender covering the Works (as defined in the Security Agreement) in an amount not less than $12,000,000 and naming Lender as loss payee and additional insured, (iii) an Affidavit of Ownership attesting to the undersigned's ownership of the Works, duly completed and executed by the undersigned, together with bills of sale with respect to the Works, (iv) a spousal affidavit from Pamela Weston; (v) an acceptable legal opinion from counsel to River North Collections, LLC and the Roger L. Weston Revocable Trust; (vi) such other documentation relating to the Obligations as the Lender may request, in each case in form and substance satisfactory to the Lender, and dated the date hereof or such other date as is satisfactory to the Lender; (vii) receipt by Lender of search results from the Art Loss Register with respect to the Works and registration with the Art Loss Register of all Works, (viii) payment of the closing fee described in Section II hereof; and (ix) reimbursement of Lender's fees and expenses, including but not limited to legal fees and expenses.

**VII. Covenants.** So long as this Note or any note or notes which may be given in renewal or extension of all or any part of the indebtedness evidenced by this Note (each of which being an "Other Note"; the indebtedness evidenced hereby or by any Other Note being hereinafter referred to as the "Obligations") shall remain unpaid, the undersigned will (and will cause each guarantor to):

(i) comply in all material respects with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and governmental charges imposed upon the undersigned or its property, except to the extent contested in good faith and by appropriate proceedings;

(ii) furnish or cause to be furnished to the Lender, as soon as available and in any event within (A) 15 days after the filing thereof, copies of the income tax returns of the undersigned and any guarantor, commencing with the year 2014 and all schedules thereto, (B) 90 days after the end of each calendar year, internally prepared financial statements of undersigned and any guarantor, in form and detail satisfactory to the Lender as of the end of or for such year, together with such other information respecting the financial condition of undersigned and any guarantor as the Lender may from time to time request; and (C) within 30 days after the end of each calendar quarter, detailed reports setting forth the location of all Collateral and noting any changes or sales since the prior quarter-end;

(iii) notify the Lender not less than thirty (30) days prior to relocating or changing undersigned's principal place of business or principal residence from the location set forth on the signature page of this Note;

(iv) give the Lender written notice of any Event of Default or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, within three Business Days of the occurrence thereof;

(v) not incur, create or suffer to exist any Debt other than the Existing Debt, up to $3,000,000 of residential mortgage Debt and up to $25,000,000 of other debt secured by income generating assets. For purposes hereof, "Debt" of any person or entity means (A) indebtedness of such person or entity for borrowed money or for the deferred purchase price of property or services, (B) all obligations of such person or entity

evidenced by bonds, notes, debentures or other similar instruments, (C) all indebtedness created or arising under any conditional sale or other title retention agreement, (D) all obligations under leases which are or should be recorded as capital leases in accordance with generally acceptable accounting principles under which such person or entity is the lessee, and (E) all amounts guaranteed directly or indirectly in any manner by such person or entity including by entering into a purchase agreement or any other means to assure a creditor against loss, including by the grant of any lien, security interest or other charge or encumbrance upon or in property;

(vi) not grant or otherwise allow to exist any liens, security interests or other encumbrances, provided that undersigned and any guarantor may grant liens to secure the Existing Debt and other Debt permitted pursuant to clause (v) above, provided further, however, that in no event shall such liens, security interests or other encumbrances encumber any of the Collateral;

(vii) not change the manager of River North Collections, LLC from Greatbanc,Inc., or allow River North Collections, LLC to have any members other than Roger L. Weston Revocable Trust; and

(viii) not use any accounts with Lender or its affiliates in connection with any business of placing, receiving or otherwise knowingly transmitting bets or wagers through the internet.

**VIII. Events of Default; Remedies.** If any of the following events ("Events of Default") shall occur and be continuing: (a) the failure of the undersigned or any guarantor to pay when due any of the Obligations when payable unless, in the case of Obligations evidenced hereby or other Obligations payable on demand, when payment is demanded; (b) the failure of the undersigned or any guarantor to perform or observe any covenant or other obligation hereunder, under the Security Agreement or under any instrument, agreement or other document delivered in connection herewith or therewith including, without limitation, the failure of the undersigned or any guarantor to furnish to the Lender any financial statement, report or other document required or requested by the Lender in accordance with Paragraph VII(ii); (c) the filing of any petition by or against the undersigned, or any guarantor, or the commencement of any proceedings for the relief or readjustment of any indebtedness of the undersigned or any guarantor, either through reorganization, composition, extension or otherwise, under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or the taking of any action by the undersigned or any guarantor to authorize any of the foregoing; (d) the general nonpayment of the undersigned or any guarantor of its debts as such debts become due, or the admission in writing by the undersigned or any guarantor of its inability to pay such debts generally, the making by the undersigned or any guarantor of a general assignment for the benefit of creditors or the taking advantage by the undersigned or any guarantor of any insolvency law; (e) the appointment of a receiver or conservator for any property of the undersigned or any guarantor; (f) the attachment or distraint of any funds or other property in which the undersigned or any guarantor has rights which may be in, or come into, the possession or control of the Lender, or of any third party acting for or designated by the Lender, or in which a security interest has been granted to or for the benefit of the Lender, or of the same becoming subject at any time to any mandatory order of any court or other legal process; (g) any representation or warranty made by the undersigned or any guarantor under or in connection with this Note, or any other agreements, instruments or other documents executed in connection herewith or therewith, or any financial statement or certificate delivered in connection herewith or therewith shall have been materially incorrect when made or deemed made; (h) the undersigned or any guarantor shall be in breach or default of its obligations under any agreement or instrument with the Lender, or any agreement or instrument with any other party, if the effect of such breach or default is to cause the obligations thereunder to become due or redeemed or to permit the holder or holders of such obligations to declare such obligations due or require such obligations to be redeemed prior to their stated maturity; (i) any judgment or order for the payment of money that is not supported by a bond or other method reasonably acceptable to the Lender is rendered by a court or governmental authority against the undersigned or any guarantor; (j) there shall occur a material adverse change in the financial condition, assets or liabilities of

the undersigned or any guarantor; or (k) the death of undersigned or any guarantor; then, (x) the Lender may declare this Note and any Other Note, all interest hereon or thereon, and any and all other amounts payable hereunder or thereunder, to be immediately due and payable, whereupon this Note, each Other Note, all such interest and all such other amounts shall become and be immediately due and payable, all without presentment, protest, demand or notice of any kind, all of which are expressly waived by the undersigned, (y) any or all of the other Obligations then existing, shall, at the option of the Lender, become due and payable forthwith and (z) the Lender may terminate any obligation it may have to make any advance hereunder, all without presentment, protest, demand or notice of any kind, all of which are expressly waived by the undersigned; provided, however, that, in the event of any actual or deemed entry of an order for relief with respect to the undersigned or any guarantor under the Federal Bankruptcy Code, this Note, each Other Note, all such interest and all such other amounts shall automatically become and be due and payable, and any such obligation of the Lender shall be terminated, all without presentment, protest, demand or notice of any kind, all of which are expressly waived by the undersigned. Notwithstanding anything to the contrary set forth herein, in the case of a non-monetary default, provided that the non-monetary default is capable of being cured, the Lender shall provide the undersigned with written notice specifying the default and a 30 day period to cure said default.

IX. **Right of Setoff.** In addition to and not in limitation of all rights of offset that the Lender or any of its affiliates may have under applicable law, whether or not the Lender has made any demand for payment hereunder or such obligations are unmatured, the Lender and its affiliates shall have the right at any time and from time to time, to the fullest extent permitted by law, with or without notice to the undersigned, to set off, appropriate and apply to the payment or reduction, either in whole or in part, of the amount owing on all or any of the Obligations evidenced by this Note or by any Other Note which may be given in renewal or extension of all or any part of such indebtedness, whether or not the Lender has made any demand for payment hereunder or the Obligations are unmatured, all deposits (general or special, time or demand, provisional or final) and other obligations at any time held or owing by the Lender or any of its affiliates to the undersigned.

X. **Costs/Expenses; Etc.** The undersigned agrees to pay on demand all costs and expenses in connection with the preparation, execution, delivery, administration, modification, amendment and enforcement (whether through legal proceedings, negotiations or otherwise) of this Note and any other document to be delivered hereunder or in connection herewith (such costs and expenses shall include, without limitation, the fees and disbursements of legal counsel). The undersigned agrees to indemnify and hold harmless the Lender and each of its directors, officers, employees, agents, affiliates and advisors from and against any and all claims, damages, losses, liabilities, costs and expenses (including, without limitation, fees and disbursements of counsel) which may be incurred by or asserted against the Lender or any such director, officer, employee, agent, affiliate or advisor in connection with or arising out of any investigation, subpoena, litigation or proceeding related to or arising out of this Note or any other document to be delivered hereunder or in connection herewith or any transaction contemplated hereby or thereby (but in any case excluding any such claims, damages, losses, liabilities, costs or expenses incurred by reason of the gross negligence or willful misconduct of the indemnitee). The obligations of the undersigned under this paragraph shall survive the payment in full of this Note.

XI. **Assignment.** The undersigned may not assign any of its rights or obligations under this Note. The Lender may assign to one or more banks or other entities all or a portion of its rights under this Note or issue pass through certificates or other securities ("Securities") evidencing a beneficial interest in a rated or unrated public offering or private placement (a "Securitization"). In the event of an assignment of all of its rights, the Lender may transfer this Note to the assignee. In the event of an assignment of a portion of its rights under this Note, the Lender shall deliver to the undersigned a new note to the order of the assignee in an amount equal to the principal amount assigned to the assignee and a new note to the order of the Lender in an amount equal to the principal amount retained by the Lender (collectively, the "New Notes"). Such New Notes shall be in an aggregate principal amount equal to the principal amount of this Note, shall be dated the effective date of the assignment and otherwise shall be substantially identical to this Note. Upon receipt of the New Notes from the Lender, the undersigned shall execute such New Notes and, at the expense of the undersigned, promptly deliver such New Notes to the Lender. Upon receipt of the executed New Notes from the undersigned, the

Lender shall return this Note to the undersigned. The Lender and the assignee shall make all appropriate adjustments in payments under this Note for periods prior to such effective date directly between themselves. In the event of an assignment of all or any portion of its rights hereunder, the Lender may transfer and deliver all or any of the property then held by it as security for the undersigned's obligations hereunder and the assignee shall thereupon become vested with all the powers and rights herein given to the Lender with respect thereto. After any such assignment or transfer, the Lender shall be forever relieved and fully discharged from any liability or responsibility in the matter, and the Lender shall retain all rights and powers hereby given with respect to property not so transferred. The Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights under this Note; provided, however, that in such case the Lender shall remain the holder of this Note and accordingly the undersigned shall continue to deal solely and directly with the Lender in connection with the Lender's rights under this Note. The Lender may, in connection with any assignment, participation or Securitization or proposed assignment, participation or Securitization, disclose to the assignee or participant or proposed assignee or proposed participant or any purchaser or prospective purchaser of Securities any information relating to the undersigned furnished to the Lender by or on behalf of the undersigned, provided that, prior to any such disclosure, the assignee, participant or purchaser or proposed assignee, participant or purchaser shall agree to preserve the confidentiality of any confidential information related to the undersigned received by it from the Lender. At the request of the Lender, at the undersigned's expense, the undersigned shall satisfy the market standards which may be reasonably required in the marketplace or by Standard & Poor's Ratings Services, a division of McGraw Hill, Inc., Moody's Investors Service, Inc., Fitch, Inc. or any other nationally-recognized statistical rating agency which has rated the Securities in connection with a Securitization or the sale or pledge of the Note, any participation therein or the Securities including, without limitation, the delivery of a certificate, in form and substance satisfactory to the Lender, confirming, among other things, the outstanding principal amount of the Obligations, that attached thereto are true and complete copies of the Note and the Security Agreement and all amendments thereto and that no Event of Default is then in existence.

**XII. "Property".** The word "property," as used herein, includes goods and merchandise, funds, cash balances, securities (including certificated, uncertificated and book-entry securities), investment property, financial assets, accounts receivable, general intangibles, choses in action and any and all other forms of property, whether real, personal, or mixed, tangible or intangible, together with the proceeds thereof, any right, title or interest of the undersigned therein or thereto, and any documents relative thereto.

**XIII. Obligations of Others.** The undersigned's obligations under this Note will also be binding on its successors and assigns.

**XIV. Notices.** All notices and other communications provided for hereunder shall be in writing and sent by certified or registered mail, return receipt requested, or nationally recognized overnight delivery service, or delivered by hand or courier, with all charges prepaid. Notices to the Lender shall be sent to its address set forth in paragraph I above. Notices to the undersigned shall be sent to the address for the undersigned set forth below until such undersigned specifies another address in a notice delivered to the Lender in accordance with this paragraph. Notice will be deemed received, if to the Lender, upon actual receipt, and if to the undersigned, within five Business Days of the mailing of notice in the case of certified or registered mail and within one Business Day if sent by overnight delivery service, or upon confirmation of delivery by hand or courier, or when delivery is refused.

**XV. Headings.** Headings as used herein are for convenience only and shall have no force or effect upon the construction or interpretation hereof.

**XVI. Severability.** In case any provision in or obligation under this Note or any other document related to this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

XVII. **Entire Agreement.** This Note and the other documents related to this Note constitute the entire understanding between the parties hereto with respect to the subject matter hereof and supersede any prior or contemporaneous agreements, written or oral, with respect thereto.

XVIII. **Waiver; Governing Law.** The undersigned hereby waives presentment for payment, demand, notice of dishonor and protest of this Note and further agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of New York in all respects, including matters of construction, validity and performance, without giving effect to principles of conflicts of law (other than under Section 5-1401 of the New York General Obligations Law, except with respect to interest rate, which shall be governed by applicable law) and that none of its terms or provisions may be waived, altered, modified or amended except as the Lender may consent thereto in writing duly signed for and on its behalf.

XIX. **Joint and Several Liability.** If there is more than one undersigned executing this Note, all agreements, conditions, covenants and provisions of this Note shall be the joint and several obligation of each undersigned.

XX. **Jurisdiction.** Without limiting the right of the Lender to bring any action or proceeding against the undersigned or against its property arising out of or relating to any obligation of the undersigned or this Note (an "Action") in the courts of other jurisdictions, the undersigned hereby irrevocably submits, with respect to any Action (and, exclusively, with respect to any other proceeding involving the undersigned and the Lender), to the jurisdiction of any New York State or Federal court sitting in New York City, and the undersigned hereby irrevocably agrees that any Action may be heard and determined in such New York State court or in such Federal court. The undersigned hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of any Action in any jurisdiction. The undersigned may be served in any manner permitted by law.

**XXI. JURY TRIAL WAIVER. THE UNDERSIGNED AND THE LENDER (BY ITS RECEIPT OF THIS NOTE) HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY OBLIGATION OF THE UNDERSIGNED OR THIS NOTE.**

Borrower:

X [signature]
ROGER L. WESTON

Address: 360 West Illinois Street, Suite 11C
Chicago, IL 60654

RIVER NORTH COLLECTIONS, LLC

By: GreatBanc, Inc., Manager

By: X [signature]
Name: Roger L. Weston
Title: President

Address: 360 West Illinois Street, Suite 11C
Chicago, IL 60654

# EXHIBIT B

SECURITY AGREEMENT (this "Security Agreement"), dated as of October 3, 2014 by River North Collections LLC, an Illinois limited liability company with its chief executive office and principal place of business located at 360 West Illinois Street, Apt 11C, Chicago, IL 60654 (the "Grantor"), in favor of Emigranta Corp. (the "Agent"), a New York corporation, with offices located at 6 East 43rd Street, 25th Floor, New York, New York 10017, as agent for Emigrant Bank Fine Art Finance, LLC (the "Lender") with offices located at 6 East 43rd Street, 25th Floor, New York, New York 10017.

**PRELIMINARY STATEMENTS**

The Lender has agreed to make a loan to the Grantor and Roger L. Weston in the aggregate principal amount of $5,000,000 (the "Loan"). The Loan is evidenced by a Term Note of even date herewith (as amended, supplemented or otherwise modified from time to time, the "Note"; capitalized terms used herein and not otherwise defined being used herein as therein defined), by the Grantor and Roger L. Weston in favor of the Lender.

It is a condition precedent to the making of the Loan by the Lender that the Grantor shall have executed and delivered this Security Agreement to provide for the grant by the Grantor of a lien on certain Works described in Section 1 of the Security Agreement, owned by the Grantor, as more fully described herein.

**NOW, THEREFORE,** in consideration of the promises and agreements herein and to induce the Lender to make the Loan, the Grantor hereby agrees as follows:

**SECTION 1.** **COLLATERAL**. As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the obligations of the Grantor under the Note (the "Obligations"), the Grantor hereby pledges and assigns to the Agent, and grants to the Agent a continuing security interest in the following (collectively, the "Collateral"): (i) the works of art described on Exhibit A attached hereto (hereinafter being collectively referred to as the "Works"), and (ii) in connection with such Works (A) all documents of title or documents representing the same and all records, files and writings with respect thereto, all accounts, contract rights, chattel paper, instruments, documents, general intangibles and other rights or obligations of any kind, whether now or hereafter existing and whether now owned or hereafter acquired, arising out of or relating thereto, (B) all rights now and hereafter existing in and to all security agreements, leases and other contracts now or hereafter existing and securing or otherwise relating to such accounts, contract rights, chattel paper, instruments, documents general intangibles or obligations (any and all such accounts, contract rights, chattel paper, instruments, documents, general intangibles and obligations being hereinafter referred to as the "Receivables"), and, (C) all proceeds of any and all of the foregoing and, to the extent not otherwise included, all payments under insurance (whether or not the Lender or Agent is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing.

**SECTION 2.** **THE GRANTOR'S REPRESENTATIONS AND WARRANTIES**. The Grantor represents and warrants to the Agent as follows:

**SECTION 2.1** **Location of Works.** For so long as any Obligations are outstanding under the Note, the Works shall be located at one of the locations listed on Exhibit A, or upon prior written notice to Agent and receipt by Agent of a fully-executed tri-party bailment agreement acceptable to Agent, may be relocated to public museums or other institutions for purposes of display of the Works.

**SECTION 2.2** **No Limitation on Agent's Rights**. None of the Works are subject to any contractual obligation that may restrict or inhibit the Agent's rights or ability to sell or dispose of the Works.

**SECTION 2.3** **Title to Collateral; Liens**. The Grantor is the sole legal and beneficial owner of the Works, and the Grantor has good and marketable title to the Works, free and clear of any liens, security interests, charges, pledges, assignments, hypothecations, claims, leases, conditional sales, options, retention of title or any other preferential arrangement having substantially the same effect as any of the foregoing, whether voluntary or imposed by law, except for the lien of this Security Agreement. No effective financing statement or other instrument similar in effect covering all or any part of the Works or other Collateral is on file in any recording office. To Grantor's knowledge, there are no ownership or other claims to or against the Works by any national treasurer or that assert that the Works constitutes war booty or stolen goods. To Grantor's knowledge, the Works have been imported to the United States and have been permanently exported from its country of origin in accordance with all applicable laws of both its country of origin and of the United States, all required declarations upon the export and import of the Works has been properly made, and all duties and taxes on such export and import have been paid.

**SECTION 2.4** **Perfection of Security Interest**. This Security Agreement is effective to create a valid security interest in favor of the Agent in the Collateral and, upon the filing of a Uniform Commercial Code financing statement naming the Grantor as debtor and the Agent as secured party and describing the Collateral, the Agent will have a duly perfected first priority security interest in the Collateral.

**SECTION 2.5** **Authenticity of the Works**. Each Work is in the possession of the Grantor and, to Grantor's knowledge, is the original, authentic product as set forth on Exhibit A and has the dimensions, is in the medium and bears the title and date specified for such Work on Exhibit A.

**SECTION 2.6** **No Consents, Authorizations, Etc**. No authorization or approval or other action by, and no notice to or filing with, any governmental authority is required for (i) the grant by the Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral, or (ii) the exercise by the Agent of any of its rights and remedies hereunder, except for the filing of the financing statement specified in Section 2.4.

**SECTION 2.7** **Insurance**. The Works are currently insured, with all premiums paid, under an insurance policy which meets the requirements of Section 3.5.

**SECTION 3.** **COVENANTS AS TO THE COLLATERAL**. So long as any of the Obligations remain outstanding:

**SECTION 3.1** **Further Assurances**. The Grantor will, at the Grantor's expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable or that the Agent may reasonably request to (i) perfect and protect the security interest created or purported to be created hereby, (ii) enable the Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral and (iii) otherwise effect the purposes of this Security Agreement including, without limitation: (A) at the request of the Agent marking conspicuously each of its records pertaining to the Collateral with a legend, in form and substance satisfactory to the Agent, indicating that such Collateral is subject to the security interest created hereby; (B) executing and filing such financing or continuation statements, or amendments thereto, as may be necessary or desirable or that the Agent may reasonably request to perfect and preserve the security interest purported to be created hereby; (C) furnishing to the Agent from time to time such other reports in connection with the Collateral as the Agent may reasonably request, all in reasonable detail; and (D) executing and delivering all instruments, documents and consents, and taking all further action that may be necessary or desirable, or that the Agent may reasonably request, in each case, with reasonable notice and during normal business hours, to enable the Agent to gain access to the premises where the Collateral is located.

**SECTION 3.2** **Location of Grantor and the Collateral**. The Grantor shall notify the Agent in writing not less than thirty (30) days prior to any change in its principal place of business from the addresses set forth in the introductory paragraph of this Security Agreement. The Grantor shall keep the Works in its possession at the locations specified in Section 2.1, or upon prior written notice to Agent and receipt by Agent of a fully-executed tri-party bailment agreement acceptable to Agent, Grantor may cause the Works to be relocated to public museums or other institutions for purposes of display and for Conservation. Upon the occurrence and during the continuance of an Event of Default, the Grantor will, at the Grantor's expense, deliver the Works or cause the Works to be delivered to any location as the Agent may designate. The Grantor acknowledges that the terms of this Security Agreement are in full force and effect at all times the Note (as defined herein) is in full force and effect wherever the Works are located throughout the entire world.

**SECTION 3.3** **Condition of the Works**. The Grantor will cause the Works to be maintained in the same condition and environment as of the date last inspected by Agent prior to the date hereof; provided, however, the Grantor may restore, conserve and repair any of the Works (collectively, "Conservation").

**SECTION 3.4** **Taxes and other Claims**. The Grantor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon or assessed with respect to, and all claims against, the Collateral.

**SECTION 3.5** **Insurance; Protective Advances**.

(a) The Grantor will, at the Grantor's expense, maintain insurance with respect to the Works in such amounts, against such risks (including, without limitation, theft, burglary, loss and damage), in such form and with such insurers as shall be satisfactory to the Lender from time to time, but in any event the amount of such insurance shall be at least $12,000,000, net of deductibles. Each policy for insurance

shall (i) name the Grantor and the Agent or Lender as insured parties thereunder (without any representation or warranty by or obligation upon the Agent or Lender) as their interests may appear and shall cover the Agent or Lender as an additional insured and co-loss payee, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Agent or Lender notwithstanding any action, inaction or breach of representation or warranty by the Grantor, (iii) provide that there shall be no recourse against the Agent or Lender for payment of premiums or other amounts with respect thereto and (iv) provide that at least thirty days' prior written notice of cancellation, lapse or substantial modification, and the opportunity to cure any failure by the Grantor to pay premiums for such policy, shall be given to the Agent or Lender by the insurer. The Grantor will deliver to the Lender original or duplicate policies of such insurance and, as often as the Lender may reasonably request, a report of a reputable insurance broker with respect to such insurance to confirm the Grantor's compliance with this Section.

(b) The Grantor shall give the Lender and the insurer immediate written notice of any loss or damage to the Works and promptly file proof of any loss with such insurers. All proceeds of insurance with respect to the Works or any other Collateral shall be paid directly to the Lender and applied to the Loan.

(c) If the Grantor shall fail to keep the Works in good condition or pay any premium that may result in the cancellation of the insurance coverage required hereunder, the Lender may, at its option, at any time and from time to time advance sums as the Lender in its discretion may deem necessary to protect the Collateral and pay any or all such insurance premiums on behalf of the Grantor. All such sums so paid or advanced by the Lender shall immediately and without demand be repaid by the Grantor to the Lender, together with interest thereon at the rate then being charged on the principal indebtedness evidenced by the Note, or, if not repaid by the Grantor, shall be added to the principal indebtedness secured by this Security Agreement.

**SECTION 3.6** **Defend Title; Notice of Adverse Claims**. The Grantor will (at the Grantor's expense) defend the Grantor's right, title and interest in and to the Works and all other Collateral against the claims of any third party. The Grantor shall notify the Agent in writing promptly after obtaining knowledge of any adverse claim with respect to the authenticity or provenance of, or of the Grantor's right, title or interest in or to, the Works.

**SECTION 3.7** **Dispositions and Other Liens**. The Grantor will not (i) sell, assign (by operation of law or otherwise), exchange or otherwise dispose of any of the Collateral, or (ii) incur, create, assume or suffer to exist any lien, directly or indirectly, upon or with respect to any of the Grantor's right, title or interest in or to any of the Collateral except for the security interest created by this Security Agreement.

**SECTION 3.8** **Inspection**. The Grantor will, at least annually and more frequently as the Agent may reasonably request, permit the Agent or its agents or representatives, at reasonable times to inspect, verify, authenticate or otherwise evaluate the location, condition, environment and value of, and the security system protecting, the Works which shall be at the Grantor's expense.

**SECTION 4.** **REMEDIES**. Upon the occurrence and during the continuance of an Event of Default:

(a) The Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the Uniform Commercial Code applicable from time to time in the State of New York (the "Code") and the Agent or its authorized agent may:

(i) require the Grantor to, and the Grantor hereby agrees that the Grantor will, at the Grantor's expense and upon request of the Agent forthwith, assemble all or part of the Collateral as directed by the Agent and make the Collateral available to the Agent at a place to be designated by the Agent that is convenient to the Agent,

(ii) require the Grantor to, and the Grantor hereby agrees that the Grantor will, at the Grantor's expense and upon the request of the Agent, make available all of the Grantor's premises and facilities for the specific purpose of the Agent's taking possession of, removing or putting the Collateral in saleable form, and

(iii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Agent's offices, at any of the Grantor's offices or places of business, at a consignee's location, at an art dealer's location or any other location, for cash, on credit, for future delivery or for any other consideration, and upon such other terms as the Agent may deem commercially reasonable.

The Agent agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale (including any auction referred to in subsection (b) below) may be made shall constitute reasonable notification. The Agent shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. The Agent may adjourn any public or private sale (including any auction referred to in subsection (b) below) from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) All cash proceeds received by the Agent in respect of any sale, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Agent, be held by the Agent as collateral for, or then or at any time thereafter be applied (after payment of any amounts payable to the Agent under Section 5.11 hereof) in whole or in part by the Agent against all or any part of any Obligations in such order as the Agent shall elect in its sole discretion.

(c) The Agent shall not be required to marshal any present or future security for the Obligations, or to resort to such security in any particular order. The

Grantor agrees, to the fullest extent permitted by law, that the Grantor will not invoke any law relating to the marshalling of collateral, and to the extent the Grantor lawfully may, the Grantor hereby irrevocably waives the benefits of all such laws.

**SECTION 5. MISCELLANEOUS PROVISIONS.**

**SECTION 5.1** **Notices**. All notices and other communications provided for herein shall be in writing and shall be mailed by registered or certified mail, return receipt requested, or nationally recognized overnight delivery service, or delivered by hand or courier to the Agent, or to the Grantor, to the addresses set forth in the introductory paragraph of this Security Agreement, or such other address as any party may from time to time designate by giving written notice to the other party hereunder. All notices and other communications given to any party hereto in accordance with the provisions of this Security Agreement shall be deemed to have been given, if to the Agent, upon its actual receipt thereof, and if to the Grantor, on the fifth Business Day after the date when sent by registered or certified mail, postage prepaid, return receipt requested, if by mail, on the next Business Day if send by overnight delivery service, or when delivered by hand or courier or when delivery is refused, in each case addressed to such party as provided in this Section 5.1 or in accordance with the latest unrevoked written direction from such party.

**SECTION 5.2** **Headings**. The headings in this Security Agreement are for purposes of reference only and shall not affect the meaning or construction of any provision of this Security Agreement.

**SECTION 5.3** **Amendments, Waivers and Consents**. Any amendment or waiver of any provision of this Security Agreement and any consent to any departure by the Grantor from any provision of this Security Agreement shall be effective only if made or given in a written agreement duly executed and delivered by the Agent.

**SECTION 5.4** **Interpretation of Agreement**. Time is of the essence in each provision of this Security Agreement of which time is an element. All terms not defined herein or in the Note shall have the meaning set forth in the Code, except where the context otherwise requires. Acceptance of or acquiescence in a course of performance rendered under this Security Agreement shall not be relevant in determining the meaning of this Security Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

**SECTION 5.5** **Continuing Security Interest**. This Security Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the indefeasible payment in full in cash of all of the Obligations, (ii) be binding upon the Agent and the Grantor and each of their respective successors, heirs and assigns and (iii) inure, together with the rights and remedies of the Agent hereunder, to the benefit of the Agent and its successors, transferees and assigns. Except as otherwise set forth herein, upon the indefeasible payment in full in cash of all of the Obligations, the Agent agrees to execute and deliver to the Grantor, at the Grantor's expense, such Uniform Commercial Code termination statements and such other documentation as shall be reasonably requested by the Grantor to

effect the termination and release of the liens on the Collateral created by this Security Agreement.

**SECTION 5.6** <u>**Reinstatement**</u>. To the extent permitted by law, this Security Agreement and the rights and powers granted to the Agent hereunder shall continue to be effective or be reinstated (following any termination of such rights and powers) if at any time any amount received by the Agent or Lender in respect of the Obligations is rescinded or must otherwise be restored or returned by the Agent or Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any person or entity or upon the appointment of any receiver, intervenor, conservator, trustee or similar official for any person or entity or any substantial part of the Grantor's assets, or otherwise, all as though such payments had not been made.

**SECTION 5.7** <u>**Survival of Provisions**</u>. All representations, warranties and covenants of the Grantor contained herein shall survive the execution and delivery of this Security Agreement and shall terminate only upon the full and final payment and performance by the Grantor of all the Obligations.

**SECTION 5.8** <u>**Power of Attorney**</u>.

(a) The Grantor hereby irrevocably authorizes and appoints the Agent, or any person or agent the Agent may designate, as the Grantor's attorney-in-fact, at the Grantor's cost and expense, to exercise, at any time after the occurrence and during the continuance of an Event of Default, which being coupled with an interest, shall be irrevocable until all of the Obligations have been paid and satisfied in full in cash:

(i) To receive, take, endorse, sign, assign and deliver, all in the name of the Agent or the Grantor, any and all checks, notes, drafts, and other agreements, documents or instruments relating to the Collateral; and

(ii) To take or bring, in the name of the Agent or the Grantor, all steps, actions, suits or proceedings deemed by the Agent necessary or desirable to enforce or effect collection of the Receivables.

(b) In addition to the powers granted to the Agent pursuant to subsection (a) above, the Grantor hereby appoints and constitutes the Agent as the Grantor's attorney-in-fact to exercise all of the following powers upon and at any time after the occurrence and during the continuance of an Event of Default: (i) collection of Receivables or proceeds of any Collateral or (ii) conveyance of any item of Collateral to any purchaser thereof. The Agent's authority hereunder shall include, without limitation, the authority to endorse and negotiate, for the Agent's account, in full or partial satisfaction, as the case may be, of the Obligations, any checks or instruments evidencing payment of the Receivables in the name of the Grantor; execute and give receipt for any certificate of ownership or any document: transfer title to any item of Collateral; send verifications of Receivables to any obligors in respect thereof sign the Grantor's name on all documents deemed necessary or appropriate to preserve, protect or perfect the security interest in the Collateral and to file the same or file this Security Agreement as a

financing statement where permitted by law; prepare, file and sign the Grantor's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with any Receivable; prepare, file and sign the Grantor's name on a proof of claim in bankruptcy or similar document against any obligor of the Grantor in respect of the Receivables; and take any other actions arising from or incident to the powers granted to the Agent under this Security Agreement. This power of attorney is coupled with an interest and is irrevocable by the Grantor until the date the Obligations are paid in full, subject to any reinstatement under Section 5.6.

**SECTION 5.9** **Appointment of Agent**. Emigranta Corp. is hereby appointed to act as Agent on behalf of the Lender. The Lender irrevocably authorizes the Agent to act on its behalf under this Agreement and, in the absence of other written instructions from the Lender received from time to time by the Agent, to exercise such powers hereunder as are specifically delegated to or required of the Agent by the terms hereof, together with such powers as may be reasonably incidental thereto.

**SECTION 5.10** **[Reserved]**.

**SECTION 5.11** **Indemnification**. The Grantor agrees to indemnify and hold harmless the Agent and its directors, officers, employees and agents including, without limitation, all professionals retained by the Agent, from and against any and all costs, expenses (including attorneys' fees and expenses), claims, or liability incurred by the Agent or such person hereunder or in connection herewith, unless such claim or liability shall be due to willful misconduct or gross negligence on the part of the Agent or such person.

**SECTION 5.12** **GOVERNING LAW**. THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

**SECTION 5.13** **Jurisdiction, Venue**. The Grantor and the Lender each irrevocably submits to the jurisdiction of any New York State or Federal court sitting in the City of New York over any suit, action or proceeding arising out of or relating to this Agreement or any Loan Document. The Grantor hereby agrees that the Lender shall have the option in its sole discretion to lay the venue of any such suit, action or proceeding in such courts of the State of New York or the United States of America and irrevocably waives to the fullest extent permitted by law any objection which the Grantor may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such court and any claim that any suit. action or proceeding brought in such court has been brought in an inconvenient form. The Grantor and the Lender each agrees that a final, non-appealable judgment of any such suit, action or proceeding brought in such a court shall be conclusive and binding upon it.

**SECTION 5.14** **WAIVER OF TRIAL BY JURY**. THE GRANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING

OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR THE
TRANSACTIONS CONTEMPLATED THEREIN. FURTHER, THE GRANTOR HEREBY
CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE LENDER OR COUNSEL
TO THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE
LENDER WOULD NOT. IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE
THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. THE GRANTOR
ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS
AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION.

    **SECTION 5.15**  **Joint and Several Liability**.  If there is more than one
Grantor executing this Security Agreement, all agreements, conditions, covenants and provisions
of this Security Agreement shall be the joint and several obligation of each Grantor.

    **SECTION 5.16**  **Delays; Partial Exercise of Remedies**.  No delay or
omission of the Agent to exercise any right or remedy hereunder shall impair any such right or
shall operate as a waiver thereof.  No single or partial exercise by the Agent of any right or
remedy shall preclude any other or further exercise thereof, or preclude any other right or
remedy.

 

 

 

**IN WITNESS WHEREOF**, the undersigned has caused this Security Agreement to be executed as of the date first above written.

RIVER NORTH COLLECTIONS, LLC

By: GreatBanc, Inc., Manager

By: ____________________
Name: Roger L. Weston
Title: President

Solely for the purposes of Section 5.9:

EMIGRANT BANK FINE ART FINANCE, LLC

By: ____________________
Name: BARBARA LUI
Title: EXECUTIVE VICE PRESIDENT

# EXHIBIT A – LIST OF WORKS AND LOCATIONS

See attached.

EXHIBIT A

| Image | ClientInvNo | Title | Period | Dynasty | Dimensions | Medium | Location | Source |
|---|---|---|---|---|---|---|---|---|
| | CH01 | Peach shape incense box with mother-of-pearl inlay | | Late Ming Dynasty | H: 2.6cm, L: 6.9cm | Lacquer on wood, mother-of-pearl, metal wire | 360 W. Illinois Street, Chicago IL 60654 | Moss |
| | CH02 | Red carved lacquer ink paste box with peony design | | Late Ming Dynasty | H: 3.8 cm, D: 6.6 | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | Moss |
| | CH03 | A small circular box with black guri decoration | | Late Ming Dynasty | H: 6.3 cm, D: 7.1 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | Greenfield |
| | CH04 | A plum blossom-shaped cinnabar lacquer dish carved with five lotus flowers on diaper ground | | Ming | D: 14.4 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH05 | A peach-shaped mother-of-pearl inlaid gilded lacquer box with five bats among clouds | 17th/18th century | | H: 4 cm, L: 12 cm | Lacquer, cloth (?), mother-of-pearl, metal interior lining | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH06 | A black tixi lacquer bowl with pommel scroll (ruyi) pattern on yellow ground | | Ming | H: 6.5 cm, D: 10.1 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH07 | A square cinnabar lacquer box carved with a scholar at lecture looking at another scholar leaving the terrace. The border carved with flowers and eight Buddhist symbols on a diaper ground. | 18th Century | Qing Dynasty, Qianlong period | H: 11.4 cm, L: 28.4 x W: 28.4 | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH08 | A rectangular red tixi lacquer tray carved with pommel scroll (ruyi) pattern | 17th-18th Century | Ming | L: 45 cm, W: 30.5 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH09 | A black tixi lacquer hexagonal ewer with top, finely carved with pommel scroll (ruyi) | 1522-1566 | Ming Dynasty, Jiajing Period | H: 28 cm | Lacquer on metal | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH10 | A small black tixi lacquer bowl with pommel scroll (ruyi) pattern with metal inside | | Ming Dynasty | H: 4.7 cm, D: 6.8 cm | Lacquer on wood or cloth/ metal lining interior | 360 W. Illinois Street, Chicago IL 60654 | PIASA |
| | CH11 | A mother-of-pearl inlaid black lacquer brush | 16th-17th Centuries | Ming | L: 8 7/8 inches | Lacquer, mother-of-pearl on wood, animal hair Attachment: Cloth Pouch, Japanese Wood Storage Box | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH12 | A four-tiered square red lacquer box and cover | 16th Century | Ming | H: 7 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH13 | A small carved red lacquer brush pot, Bitong | 18th Century | | H: 4 1/8 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |

EXHIBIT A

| Image | ClientInvNo | Title | Period | Dynasty | Dimensions | Medium | Location | Source |
|---|---|---|---|---|---|---|---|---|
| | CH14 | A large carved red lacquer pear-shaped vase, Hu | 1736-1795 | Qing, Qianlong period | H: 18 1/2 inches | Lacquer on wood (Base: wood) | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH15 | A group of five ink cakes | | Qing | (from left) (1) 20.5x8.0, (2) 9.7x5.1, (3) 7.5x4.5, (4) 8.5x5.0, (5)18.5x11.0 cm | Ink cake with colours on surface | 360 W. Illinois Street, Chicago IL 60654 | Bonhams, San Francisco |
| | CH16 | Red carved lacquer snuff bottle with dragons in the cloud | 1860-1930 | | H: 2 inches | Lacquer, metal, wood and/or metal base (?), paper mâchér or textile | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH17 | Polychrome carved lacquer snuff bottle with figures in the landscape | 1860-1920 | | H: 3 1/8 inches | Lacquer on wood and/or metal base (?), metal | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH18 | Red carved lacquer snuff bottle with phoenixes in cloud | 1780-1880 | Probably Imperial | H: 2 inches | Lacquer on (wood or metal?), gilt metal top | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH19 | A fine guri lacquer brush and cover with scrolls, wood box, cloth pouch | 15th Century | | L: 9 inches | Lacquer on wood, animal hair and Cloth, Pouch, Japanese Wood Box | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH20 | A fine red lacquer brush and cover with 'three friends of winter' | | Late Ming/early Qing | L: 10 inches | Lacquer on wood, animal hair with Cloth, Pouch, Japanese Wood Box | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH21 | Qiangjin' polychrome lacquer quatrefoil dish, Qianlong mark and period | Qianlong | Qing | L: 6 5/8 inches, W: 5 3/8 inches | | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH22 | A black lacquer six-lobed bowl | 1279-1368 | Yuan | D: 5 inches | | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH23 | A pewter inlaid lobed black lacquer box and cover | 1279-1368 | Yuan | L: 7.5 inches | with Japanese wood box | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH24 | A very rare and finely carved cinnabar lacquer circular dish | 1279-1368 | Yuan | D: 12 1/4 inches | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH25 | A polychrome tixi lacquer bowlstand | 960-1368 | Song-Yuan | D: 7 7/8 inches | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | Andrew Kahane |
| | CH26 | An exquisitly carved polychrome lacquer 'lotus' circular dish | 1127-1279 | Southern Song | D: 7 1/8 inches | Japanese wood box | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |

EXHIBIT A

| Image | ClientInvNo | Title | Period | Dynasty | Dimensions | Medium | Location | Source |
|---|---|---|---|---|---|---|---|---|
| | CH27 | An important and very rare inlaid mother-of-pearl rectangular stationery box and cover | 1279-1368 | Yuan | L: 11 7/16 inches | Lacquer on wood, inlaid with mother-of-pearl and metal wire | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH28 | Guri brush handle and cover | 13th | Late Song early Yuan | | | 360 W. Illinois Street, Chicago IL 60654 | Moss |
| | CH29 | A small red carved lacquer in a vase shape | | | | | 360 W. Illinois Street, Chicago IL 60654 | Nagel |
| | CH30 | A red carved laqcquer 'prunus'dish | | Ming | D: 11.5 inches | | 360 W. Illinois Street, Chicago IL 60654 | Sotheby's, London |
| | CH31 | A mother-of-pearl inlaid lacquer tray | 1522-1566 | Ming, Jiajing Period | L:16 7/8 inches, W: 10 1/2 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH32 | A mother-of-pearl inlaid black lacquer square box and cover with sima xiangru scene | 1260–1358 | Yuan | H:2 1/2 inches, W:6 3/4 inches, D:6 3/4 inches | Lacquer on wood, inlaid with mother-of-pearl and metal wire | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH33 | A mother-of-pearl inlaid black lacquer octagonal box and cover | 1260–1358 | Yuan | H: 4 3/4 inches, W: 10 inches, 1/4, L: 10 1/4 inches | Lacquer on wood, mother-of-pearl | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH34 | A pair of lacquered wood wine cups | 4th-3rd BC | Eastern Zhou | L: 6 1/4 inches each | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH35 | A black inlaid lacquer square dish with everted sides and indented corners, standing on a low sturdy wedge-shaped foot | 14th-15th centuries | Late Yuan or Early Ming | W: 17.8 cm | | 360 W. Illinois Street, Chicago IL 60654 | Ezkenazi, London |
| | CH36 | A mother-of-peral inlaid lacquer tray | 16th Century | Ming | L: 18 1/4 inches | | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH37 | A rare brown lacquer flower-shaped dish | | Song/Yuan | D: 10 3/4 inches | | 360 W. Illinois Street, Chicago IL 60654 | Sebastian Izzard |
| | CH38 | A rare black lacquer bracket-lobed dish | 1279-1368 | Yuan | D: 8 1/4 inches | | 360 W. Illinois Street, Chicago IL 60654 | Ezkenazi, London |
| | CH39 | A black lacquer bracket-lobed tray | 960-1279 | Song | D: 14 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |

EXHIBIT A

| Image | ClientInvNo | Title | Period | Dynasty | Dimensions | Medium | Location | Source |
|---|---|---|---|---|---|---|---|---|
| | CH40 | Carved Cinnabar Lacquer 'Dragon' Bowlstand | 1426-1435 | Early Ming | D: 5 1/8 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH41 | An extremely rare carved black and cinnabar lacquer 'rose' circular dish | 960-1279 | Song | D: 7 1/2 inches | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH42 | A rare carved tixi cinnabar lacquer lobed tray | 960-1368 | Song/ Yuan | 17.5 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH43 | A mallow form dish brown lacquer the rim bound with a copper band | 13th century | Southern Song | D: 15 cm | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH44 | A black lacquer cupstand but with some red layers decorated overall with bands of tixi | 13-14th century | Yuan | D: 16.6 cm | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH45 | Bronze Bowl Stand | 10th-13th Century AD 960-1279 | Song | H: 2 inches, D: 5 3/4 inches | Bronze | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH46 | A circular box and cover of rounded form with shallow recessed base, guri scrolls, Shou character on top surrounded by four further characters | 15th century | Ming | D: 16.5 cm | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH47 | A small imperial seal past box in stylized lotus design | ca. 1400 | Early Ming | D: 8 cm | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH48 | An octagonal tray with mother-of-pearl inlay of the interior with a garden landscape with scholars playing weiqi | 16th Century AD | Ming | D: 13 inches | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH49 | An imperial cinnabar lacquer daoist subject box and cover | 1522-1566 | Ming, Jiajing mark and period | D: 7 1/4 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH50 | Carved Polychrome Lacquer Domed Peach-Shaped Box and Cover | 1522-1566 | Ming, Jiajing mark and period | D: 3 1/8 inches | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH51 | Carved Cinnabar Lacquer Box and Cover with Boys | 16th/17th century | Ming | D: 3 1/8 inches | Japanese wood box | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH52 | Red round incense box with carved flowering branches of prunus on a finely drawn water diaper ground | 15th Century AD | Ming | D: 3 inches | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |

EXHIBIT A

| Image | ClientInvNo | Title | Period | Dynasty | Dimensions | Medium | Location | Source |
|---|---|---|---|---|---|---|---|---|
| | CH53 | A red carved circular dish with two phoenix amongst flowering lotus flowers and foliage | 13th century | Southern Song/ early Yuan | D 21.7 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH54 | Black tixi lacquer lobed tray | 16th Century AD | Late Ming | D: 48.5 cm | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH55 | Painted lacquer circular box and cover | 4th- 3rd century BC | Late Eastern Zhou | D: 8 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH56 | Wood Fragments | 4th- 3rd century BC | Late Eastern Zhou | W: 5 5/8 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH57 | An old Chinese seal paste box and cover of cylindrical form; cinnabar lacquer carved on the top with a scene of boys at play amongst rocks and pine all on an earth diaper ground; the sides carved with a continuous band of key-fret design | 14th/15th century AD | Yuan | D: 7.2 cm | | 360 W. Illinois Street, Chicago IL 60654 | Anthony Carter |
| | CH58 | Large Carved Tixi lacquer scroll tray | 14th-15th centuries | Ming | L: 22 1/4 inches | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH59 | Brown lacquer writing box and cover with mother-of-pearl inlay of mandarin ducks | 14th-15th centuries | Yuan/early Ming | L: 11 inches, W: 8 1/4 inches | Lacquer on wood, mother-of-pearl. Implements: inkstone, and bronze water-dropper Japanese wood box | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH60 | An unusual white stoneware flask in the form of a leather pouch | 10th century | Liao | H: 9 1/8 inches | | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH61 | Persimmon-colored Stoneware Tea Bowl | 11th-12th centuries | Northern Song | D: 4 7/8 inches | Stoneware | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH62 | Carved Rectangular Tray with Two Birds | 14th century | Yuan | L 37.0 cm, W 14.3 cm, H 3.0 cm | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH63 | Silver octafoil dish with two birds | 12th-13th century | Southern Song | D: 5 1/2 inches | Silver | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH64 | Carved Cinnabar Lacquer Lobed Tray | 15th century | Ming | W: 11 1/6 inches | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH65 | Carved Cinnabar Lacquer Square Tray with Landscape | 16th/17th century | Ming | L: 7 7/16 inches, H: 7 7/16 inches, square | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |

EXHIBIT A

| Image | ClientInvNo | Title | Period | Dynasty | Dimensions | Medium | Location | Source |
|---|---|---|---|---|---|---|---|---|
| | CH66 | Polychrome Lacquer Rectangular Tray with Chinese Landscape | 16th century | Ming | L: 13 1/2 inches | Lacquer on wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH67 | A red lacquer foliate-rimmed dish | 1127–1279 | Southern Song | D: 8 3/8 inches | Lacquer on wood and cloth | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH68 | A black lacquer guri box and cover | | Song | D: 3 5/8 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH69 | A brown-glazed porcelain tea bowl | 1127-1279 | Southern Song | D: 4 3/4 inches | Porcelain | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH70 | A rare red lacquer pentafoil dish | 960-1279 | Song | D: 7 inches | Lacquer on wood, metal rim | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH71 | A set of five 'Prunes Blossom' lacquer dishes | 11th-12th centuries | Song | D: 6 inches, each | Lacquer on wood, lip mounted in metal | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH72 | A Black Lacquer Spoon | | Northern Song | L: 10 1/8 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH73 | A pair of black lacquer chopsticks | | Northern Song | L: 11 1/4 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH74 | A Carved Red, Yellow, Green and Black Lacquer 'Qilin' Dish | 1522-1566 | Ming Dynasty, Jiajing Period | D: 6 5/8 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH75 | A Cinnabar Lacquer 'Chrysanthemum' Brush and Cover | 16th Century | Ming Dynasty | L: 9 7/8 inches | Lacquer on wood (or/and cloth), animal hair | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH76 | Carved Lacquer Bowl with two ruyi-head scrolls | 16th Century | Ming | D: 7 5/8 inches | Lacquer on wood, interior with silver plated lining | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |
| | CH77 | Yunnan style carved lacquer box and cover with floral design | 16th Century | Ming | D: 8 inches | Lacquer on Wood | 360 W. Illinois Street, Chicago IL 60654 | JJ Lally |

# EXHIBIT C

# ALLONGE TO TERM NOTE

| | |
|---|---|
| **PAYOR:** | River North Collections, LLC and Roger L. Weston (jointly, severally and collectively, the "Borrower") |
| **PAYEE:** | Emigrant Bank Fine Art Finance, LLC ("Lender") |
| **DATE OF NOTE:** | October 3, 2014 |
| **ORIGINAL PRINCIPAL AMOUNT:** | $5,000,000 |

## BACKGROUND

A. The Lender is the holder of a certain Term Note, dated October 3, 2014, executed by the Borrower and delivered to the Lender in the original principal amount of $5,000,000 (as amended from time to time, the "Note").

B. The Lender has agreed, upon the request of the Borrower and subject to the satisfaction of certain other terms and conditions, among other things, to amend the Note.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Borrower and the Lender agree as follows:

1. This Allonge to Term Note ("Allonge") shall be and remain attached to and shall constitute an integral part of the Note from and after the date hereof.

2. All references in the Note to the term *"Note"* shall mean the Note as amended by this Allonge.

3. Section VII(ii)(C) of the Note is deleted in its entirety.

4. The effectiveness of this Allonge is subject to the Lender's receipt of an original countersigned copy by Borrower of this Allonge.

5. This Allonge shall be an amendment to, but not a cancellation or satisfaction of, the Note.

6. This Allonge and all documents comprising or relating to this Allonge shall be construed in accordance with and governed by the internal laws of the State of New York without reference to conflict of laws principles.

7. This Allonge and all documents referred to in, comprising or relating to this Allonge, constitute the sole agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof.

8. Any provision in this Allonge that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void or invalid without affecting the remaining provisions in any other jurisdiction, and to this end the provisions of this Allonge are declared to be severable.

**9. EXCEPT AS MODIFIED HEREBY, ALL OF THE TERMS AND PROVISIONS OF THE NOTE ARE HEREBY RATIFIED AND CONFIRMED.**

**IN WITNESS WHEREOF,** this Allonge to Term Note has been executed by the undersigned as of December 9, 2015.

x [signature]
Roger L. Weston

**RIVER NORTH COLLECTIONS, LLC**

By: GreatBanc, Inc., Manager

By: x [signature]
Name: Roger L. Weston
Title: President

**EMIGRANT BANK FINE ART FINANCE, LLC**

By: [signature]
Name: Li Jun Xian
Title: Vice President

# EXHIBIT D

# SECOND ALLONGE TO TERM NOTE

| | |
|---|---|
| **ORIGINAL PAYOR:** | River North Collections, LLC and Roger L. Weston (jointly, severally and collectively, the "Borrower") |
| **PAYEE:** | Emigrant Bank Fine Art Finance, LLC ("Lender") |
| **DATE OF NOTE:** | October 3, 2014 |
| **ORIGINAL PRINCIPAL AMOUNT:** | $5,000,000 |

## BACKGROUND

A. The Lender is the holder of a certain Term Note, dated October 3, 2014, executed by the Borrower and delivered to the Lender in the original principal amount of $5,000,000 (as amended from time to time, the "Note").

B. River North Collections, LLC has advised the Lender that it has changed its name to Weston Collection, LLC.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Borrower and the Lender agree as follows:

1. This Second Allonge to Term Note ("Allonge") shall be and remain attached to and shall constitute an integral part of the Note from and after the date hereof.

2. All references in the Note to the term *"Note"* shall mean the Note as amended by this Allonge.

3. All references in the Note to "River North Collections, LLC" shall be deemed references to Weston Collection, LLC, f/k/a River North Collections, LLC.

4. The effectiveness of this Allonge is subject to the Lender's receipt of an original countersigned copy by Borrower of this Allonge.

5. This Allonge shall be an amendment to, but not a cancellation or satisfaction of, the Note.

6. This Allonge and all documents comprising or relating to this Allonge shall be construed in accordance with and governed by the internal laws of the State of New York without reference to conflict of laws principles.

US_ACTIVE-134693138.1

7. This Allonge and all documents referred to in, comprising or relating to this Allonge, constitute the sole agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof.

8. Any provision in this Allonge that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void or invalid without affecting the remaining provisions in any other jurisdiction, and to this end the provisions of this Allonge are declared to be severable.

**9. EXCEPT AS MODIFIED HEREBY, ALL OF THE TERMS AND PROVISIONS OF THE NOTE ARE HEREBY RATIFIED AND CONFIRMED.**

**IN WITNESS WHEREOF,** this Second Allonge to Term Note has been executed by the undersigned as of June 5, 2017.

Roger L. Weston

**WESTON COLLECTION, LLC f/k/a River North Collections, LLC**

By: GreatBanc., Inc., Manager

By:
Name: Roger L. Weston
Title: President

**EMIGRANT BANK FINE ART FINANCE, LLC**

By:____________________________
Name:
Title:

7. This Allonge and all documents referred to in, comprising or relating to this Allonge, constitute the sole agreement of the parties with respect to the subject matter hereof and thereof and supersede all oral negotiations and prior writings with respect to the subject matter hereof and thereof.

8. Any provision in this Allonge that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void or invalid without affecting the remaining provisions in any other jurisdiction, and to this end the provisions of this Allonge are declared to be severable.

**9. EXCEPT AS MODIFIED HEREBY, ALL OF THE TERMS AND PROVISIONS OF THE NOTE ARE HEREBY RATIFIED AND CONFIRMED.**

**IN WITNESS WHEREOF,** this Second Allonge to Term Note has been executed by the undersigned as of June __, 2017.

______________________________
Roger L. Weston

**WESTON COLLECTION, LLC f/k/a River North Collections, LLC**

By: GreatBanc., Inc., Manager

By:______________________________
Name: Roger L. Weston
Title: President

**EMIGRANT BANK FINE ART FINANCE, LLC**

By:______________________________
Name: LIJUN XIAN
Title: Partner

# EXHIBIT E

# AMENDMENT OF SECURITY AGREEMENT

This AMENDMENT OF SECURITY AGREEMENT ("Amendment"), is entered into as of June 5, 2017, between **WESTON COLLECTION, LLC f/k/a River North Collections, LLC** (the "Grantor") and **EMIGRANTA CORP.** (the "Agent"), as agent for Emigrant Bank Fine Art Finance, LLC (the "Lender").

## BACKGROUND

A. The Grantor has previously delivered that certain Security Agreement dated as of October 3, 2014 (as amended, modified, supplemented or restated from time to time, the "Security Agreement"), which secures certain loans made by Lender to Grantor.

B. Grantor as advised the Agent and the Lender that it has changed its name from River North Collections, LLC to Weston Collection, LLC.

C. All terms capitalized but not defined herein shall have the meanings ascribed to them in the Security Agreement.

NOW, THEREFORE, incorporating the Background section herein, intending to be legally bound hereby and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. Amendment to Security Agreement.

1.1 All references in the Note to "River North Collections, LLC" shall be deemed references to Weston Collection, LLC, f/k/a River North Collections, LLC.

Section 2. Reaffirmation.

2.1 As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, the Grantor hereby pledges, mortgages, charges, hypothecates and assigns (by way of security) to the Agent, and grants to the Agent a continuing security interest in, all of Grantor's right, title and interest in the Collateral. To the extent the Grantor has granted a security interest to the Agent under the Security Agreement in any or all of the Collateral prior to the date of this Amendment, this Amendment shall be deemed to be a reaffirmation of the previously granted security interest(s). Grantor acknowledges that this Amendment does not extinguish the liens and security interests created under the Security Agreement and Grantor reaffirms the previously granted security interests thereunder. It is the intention of the Grantor and the Agent that all existing security interests remain continuously perfected.

2.2 Except as expressly provided herein, nothing contained herein shall alter or amend the terms of the Security Agreement, and Grantor confirms and agrees to be bound by all of the terms and conditions contained in the Security Agreement.

2.3 The Grantor hereby reaffirms all of its representations, warranties, and covenants to the Agent contained in the Security Agreement (including but not limited to the

powers of attorney contained therein) and warrants that all such representations, warranties, and covenants are true and correct as of the date hereof.

Section 3. Miscellaneous.

3.1 The Amendment shall be governed by and constructed in accordance with the laws of the State of New York without giving effect to the conflict of law principles thereof (other than Section 5-1401 of the New York General Obligations Law).

3.2 Grantor agrees to do such further acts and execute and deliver to the Agent such additional agreements, instruments and documents as may be reasonably required to carry out the purpose of this Amendment.

3.3 Any provision in this Amendment that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void or invalid without affecting the remaining provisions in any other jurisdiction, and to this end the provisions of this Amendment are declared to be severable.

3.4 This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts. Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Amendment.

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed by their duly authorized officers on the date first above written.

**WESTON COLLECTION, LLC f/k/a River North Collections, LLC**

By: GreatBanc., Inc., Manager

By:________________________
Name: Roger L. Weston
Title: President

**EMIGRANTA CORP.**

By:________________________
Name:
Title:

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed by their duly authorized officers on the date first above written.

**WESTON COLLECTION, LLC f/k/a River North Collections, LLC**

By: GreatBanc., Inc., Manager

By:______________________________
Name: Roger L. Weston
Title: President

**EMIGRANTA CORP.**

By:______________________________
Name: CHUNXIAN
Title: Partner

# EXHIBIT F

RECEIVED
IL SECRETARY OF STATE
UNIFORM COMMERCIAL CODE
20141003 1129
$20.00 Electronic

**19691608** FS

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Corporation Service Company 800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
FilingDept@cscinfo.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL, 62703

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| River North Collections, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 360 W. Illinois St., Suite 11C | Chicago | IL | 60654 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| EMIGRANTA CORP. | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6 E. 43rd Street | New York | NY | 10017 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
The property in Schedule A and all proceeds thereof and any amount, including but not limited to any insurance proceeds, that compensates or indemnifies for the loss or damage to any such property.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decendent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
WESTON [90391752]

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
|  | Peach shape incense box with mother-of-pearl inlay | | Late Ming Dynasty | H: 2.6cm, L: 6.9cm | Lacquer on wood, mother-of-pearl, metal wire |
|  | Red carved lacquer ink paste box with peony design | | Late Ming Dynasty | H: 3.8 cm, D: 6.5 | Lacquer on wood |
|  | A small circular box with black guri decoration | | Late Ming Dynasty | H: 6.3 cm, D: 7.1 cm | Lacquer on wood |
|  | A plum blossom-shaped cinnabar lacquer dish carved with five lotus flowers on diaper ground | | Ming | D: 14.4 cm | Lacquer on wood |
|  | A peach-shaped mother-of-pearl inlaid gilded lacquer box with five bats among clouds | 17th/18th century | | H: 4 cm, L: 12 cm | Lacquer, cloth (?), mother-of-pearl, metal interior lining |
|  | A black tixi lacquer bowl with pommel scroll (ruyi) pattern on yellow ground | | Ming | H: 6.5 cm, D: 10.1 cm | Lacquer on wood |
|  | A square cinnabar lacquer box carved with a scholar at lecture looking at another scholar leaving the terrace. The border carved with flowers and eight Buddhist symbols on a diaper ground. | 18th Century | Qing Dynasty, Qianlong period | H: 11.4 cm, L: 28.4 x W: 28.4 | Lacquer on wood |
|  | A rectangular red tixi lacquer tray carved with pommel scroll (ruyi) pattern | 17th-18th Century | Ming | L: 45 cm, W: 30.5 cm | Lacquer on wood |
|  | A black tixi lacquer hexagonal ewer with top, finely carved with pommel scroll (ruyi) | 1522-1566 | Ming Dynasty, Jiajing Period | H: 28 cm | Lacquer on metal |
|  | A small black tixi lacquer bowl with pommel scroll (ruyi) pattern with metal inside | | Ming Dynasty | H: 4.7 cm, D: 6.8 cm | Lacquer on wood or cloth/ metal lining interior |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
| | A mother-of-pearl inlaid black lacquer brush | 16th-17th Centuries | Ming | L: 8 7/8 inches | Lacquer, mother-of-pearl on wood, animal hair Attachment: Cloth Pouch, Japanese Wood Storage Box |
| | A four-tiered square red lacquer box and cover | 16th Century | Ming | H: 7 inches | Lacquer on Wood |
| | A small carved red lacquer brush pot, Bitong | 18th Century | | H: 4 1/8 inches | Lacquer on Wood |
| | A large carved red lacquer pear-shaped vase, Hu | 1736-1795 | Qing, Qianlong period | H: 18 1/2 inches | Lacquer on wood (Base: wood) |
| | A group of five ink cakes | | Qing | (from left) (1) 20.5x8.0, (2) 9.7x5.1, (3) 7.5x4.5, (4) 8.5x5.0, (5)18.5x11.0 cm | Ink cake with colours on surface |
| | Red carved lacquer snuff bottle with dragons in the cloud | 1860-1930 | | H: 2 inches | Lacquer, metal, wood and/or metal base (?), paper mâchér or textile |
| | Polychrome carved lacquer snuff bottle with figures in the landscape | 1860-1920 | | H: 3 1/8 inches | Lacquer on wood and/or metal base (?), metal |
| | Red carved lacquer snuff bottle with phoenixes in cloud | 1780-1880 | Probably Imperial | H: 2 inches | Lacquer on (wood or metal?), gilt metal top |
| | A fine guri lacquer brush and cover with scrolls, wood box, cloth pouch | 15th Century | | L: 9 inches | Lacquer on wood, animal hair and Cloth, Pouch, Japanese Wood Box |
| | A fine red lacquer brush and cover with 'three friends of winter' | | Late Ming/early Qing | L: 10 inches | Lacquer on wood, animal hair with Cloth, Pouch, Japanese Wood Box |
| | Qiangjin' polychrome lacquer quatrefoil dish, Qianlong mark and period | Qianlong | Qing | L: 6 5/8 inches, W: 5 3/8 inches | |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
|  | A black lacquer six-lobed bowl | 1279-1368 | Yuan | D: 5 inches | |
|  | A pewter inlaid lobed black lacquer box and cover | 1279-1368 | Yuan | L: 7.5 inches | with Japanese wood box |
|  | A very rare and finely carved cinnabar lacquer circular dish | 1279-1368 | Yuan | D: 12 1/4 inches | Lacquer on wood |
|  | A polychrome tixi lacquer bowlstand | 960-1368 | Song-Yuan | D: 7 7/8 inches | Lacquer on wood |
|  | An exquisitly carved polychrome lacquer 'lotus' circular dish | 1127-1279 | Southern Song | D: 7 1/8 inches | Japanese wood box |
|  | An important and very rare inlaid mother-of-pearl rectangular stationery box and cover | 1279-1368 | Yuan | L: 11 7/16 inches | Lacquer on wood, inlaid with mother-of-pearl and metal wire |
|  | Guri brush handle and cover | 13th | Late Song early Yuan | | |
|  | A small red carved lacquer in a vase shape | | | | |
|  | A red carved laqcquer 'prunus'dish | | Ming | D: 11.5 inches | |
|  | A mother-of-pearl inlaid lacquer tray | 1522-1566 | Ming, Jiajing Period | L:16 7/8 inches, W: 10 1/2 inches | |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
|  | A mother-of-pearl inlaid black lacquer square box and cover with sima xiangru scene | 1260–1358 | Yuan | H:2 1/2 inches, W:6 3/4 inches, D:6 3/4 inches | Lacquer on wood, inlaid with mother-of-pearl and metal wire |
|  | A mother-of-pearl inlaid black lacquer octagonal box and cover | 1260–1358 | Yuan | H: 4 3/4 inches, W: 10 inches, 1/4. L: 10 1/4 inches | Lacquer on wood, mother-of-pearl |
|  | A pair of lacquered wood wine cups | 4th-3rd BC | Eastern Zhou | L: 6 1/4 inches each | Lacquer on wood |
|  | A black inlaid lacquer square dish with everted sides and indented corners, standing on a low sturdy wedge-shaped foot | 14th-15th centuries | Late Yuan or Early Ming | W: 17.8 cm | |
|  | A mother-of-peral inlaid lacquer tray | 16th Century | Ming | L: 18 1/4 inches | |
|  | A rare brown lacquer flower-shaped dish | | Song/Yuan | D: 10 3/4 inches | |
|  | A rare black lacquer bracket-lobed dish | 1279-1368 | Yuan | D: 8 1/4 inches | |
|  | A black lacquer bracket-lobed tray | 960-1279 | Song | D: 14 inches | |
|  | Carved Cinnabar Lacquer 'Dragon' Bowlstand | 1426-1435 | Early Ming | D: 5 1/8 inches | |
|  | An extremely rare carved black and cinnabar lacquer 'rose' circular dish | 960-1279 | Song | D: 7 1/2 inches | |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
| | A rare carved tixi cinnabar lacquer lobed tray | 960-1368 | Song/ Yuan | 17.5 cm | Lacquer on wood |
| | A mallow form dish brown lacquer the rim bound with a copper band | 13th century | Southern Song | D: 15 cm | |
| | A black lacquer cupstand but with some red layers decorated overall with bands of tixi | 13-14th century | Yuan | D: 16.6 cm | |
| | Bronze Bowl Stand | 10th-13th Century AD 960-1279 | Song | H: 2 inches, D: 5 3/4 inches | Bronze |
| | A circular box and cover of rounded form with shallow recessed base, guri scrolls, Shou character on top surrounded by four further characters | 15th century | Ming | D: 16.5 cm | |
| | A small Imperial seal past box in stylized lotus design | ca. 1400 | Early Ming | D: 8 cm | |
| | An octagonal tray with mother-of-pearl inlay of the interior with a garden landscape with scholars playing weigi | 16th Century AD | Ming | D: 13 inches | |
| | An imperial cinnabar lacquer daoist subject box and cover | 1522-1566 | Ming, Jiajing mark and period | D: 7 1/4 inches | |
| | Carved Polychrome Lacquer Domed Peach-Shaped Box and Cover | 1522-1566 | Ming, Jiajing mark and period | D: 3 1/8 inches | Lacquer on wood |
| | Carved Cinnabar Lacquer Box and Cover with Boys | 16th/17th century | Ming | D: 3 1/8 inches | Japanese wood box |
| | Red round incense box with carved flowering branches of prunus on a finely drawn water diaper ground | 15th Century AD | Ming | D: 3 inches | |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
|  | A red carved circular dish with two phoenix amongst flowering lotus flowers and foliage | 13th century | Southern Song/ early Yuan | D 21.7 cm | Lacquer on wood |
|  | Black tixi lacquer lobed tray | 16th Century AD | Late Ming | D: 48.5 cm | |
|  | Painted lacquer circular box and cover | 4th- 3rd century BC | Late Eastern Zhou | D: 8 inches | |
|  | Wood Fragments | 4th- 3rd century BC | Late Eastern Zhou | W: 5 5/8 inches | |
|  | An old Chinese seal paste box and cover of cylindrical form; cinnabar lacquer carved on the top with a scene of boys at play amongst rocks and pine all on an earth diaper ground; the sides carved with a continuous band of key-fret design | 14th/15th century AD | Yuan | D: 7.2 cm | |
|  | Large Carved Tixi lacquer scroll tray | 14th-15th centuries | Ming | L: 22 1/4 inches | Lacquer on wood |
|  | Brown lacquer writing box and cover with mother-of-pearl inlay of mandarin ducks | 14th-15th centuries | Yuan/early Ming | L: 11 inches, W: 8 1/4 inches | Lacquer on wood, mother-of-pearl. Implements: inkstone, and bronze water-dropper Japanese wood box |
|  | An unusual white stoneware flask in the form of a leather pouch | 10th century | Liao | H: 9 1/8 inches | |
|  | Persimmon-colored Stoneware Tea Bowl | 11th-12th centuries | Northern Song | D: 4 7/8 inches | Stoneware |
|  | Carved Rectangular Tray with Two Birds | 14th century | Yuan | L 37.0 cm, W 14.3 cm, H 3.0 cm | Lacquer on wood |
|  | Silver octafoil dish with two birds | 12th-13th century | Southern Song | D: 5 1/2 inches | Silver |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
|  | Carved Cinnabar Lacquer Lobed Tray | 15th century | Ming | W: 11 1/6 inches | Lacquer on wood |
|  | Carved Cinnabar Lacquer Square Tray with Landscape | 16th/17th century | Ming | L: 7 7/16 inches, H: 7 7/16 inches, square | Lacquer on wood |
|  | Polychrome Lacquer Rectangular Tray with Chinese Landscape | 16th century | Ming | L: 13 1/2 inches | Lacquer on wood |
|  | A red lacquer foliate-rimmed dish | 1127–1279 | Southern Song | D: 8 3/8 inches | Lacquer on wood and cloth |
|  | A black lacquer guri box and cover | | Song | D: 3 5/8 inches | Lacquer on Wood |
|  | A brown-glazed porcelain tea bowl | 1127-1279 | Southern Song | D: 4 3/4 inches | Porcelain |
|  | A rare red lacquer pentafoil dish | 960-1279 | Song | D: 7 inches | Lacquer on wood, metal rim |
|  | A set of five 'Prunes Blossom' lacquer dishes | 11th-12th centuries | Song | D: 6 inches, each | Lacquer on wood, lip mounted in metal |
|  | A Black Lacquer Spoon | | Northern Song | L: 10 1/8 inches | Lacquer on Wood |
|  | A pair of black lacquer chopsticks | | Northern Song | L: 11 1/4 inches | Lacquer on Wood |
|  | A Carved Red, Yellow, Green and Black Lacquer 'Qilin' Dish | 1522-1566 | Ming Dynasty, Jiajing Period | D: 6 5/8 inches | Lacquer on Wood |

SCHEDULE A

| Image | Title | Period | Dynasty | Dimensions | Medium |
|---|---|---|---|---|---|
|  | A Cinnabar Lacquer 'Chrysanthemum' Brush and Cover | 16th Century | Ming Dynasty | L: 9 7/8 inches | Lacquer on wood (or/and cloth), animal hair |
|  | Carved Lacquer Bowl with two ruyi-head scrolls | 16th Century | Ming | D: 7 5/8 inches | Lacquer on wood, interior with silver plated lining |
|  | Yunnan style carved lacquer box and cover with floral design | 16th Century | Ming | D: 8 inches | Lacquer on Wood |